UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAD MOBILE, INC., a Florida corporation,

      Plaintiff,

    v.

MEIJER GREAT LAKES LIMITED
PARTNERSHIP, a Michigan limited
partnership,

      Defendant.

Case No. 1:23-cv-1020

The Honorable _____

---

## COMPLAINT

As its Complaint in this action, Plaintiff Mad Mobile, Inc. ("**Mad Mobile**") seeks preliminary injunctive relief in aid of an arbitration it has filed against Defendant Meijer Great Lakes Limited Partnership ("**Meijer**").

## <u>NATURE OF THE ACTION</u>

1.    Mad Mobile is a software development company that specializes in next-generation systems for customers and employees to use for purchases at retail stores and restaurants. Mad Mobile has developed a broad array of proprietary information and know-how, including system architectures, business processes, and software schema, as well as confidential source code that provides Mad Mobile a competitive advantage (collectively, "**Proprietary Technology**").

2.    Meijer, a multi-billion-dollar company, hired Mad Mobile in 2019 to develop next-generation software for customer and employee checkout terminals in Meijer's supercenters, and Meijer agreed and committed to pay Mad Mobile millions of dollars in usage fees once the software was implemented. As part of that effort, Mad Mobile showed Meijer how to change its business practices and systems. Mad Mobile committed substantial resources to the endeavor,

spending more than twice as much as Meijer paid it as an investment in securing the future usage fees Meijer would pay it.

3.      But secretly, flexing its vastly superior financial resources, Meijer stole Mad Mobile's Proprietary Technology. Meijer built a huge internal team that carefully studied and learned Mad Mobile's Proprietary Technology. Earlier this year, after coaxing Mad Mobile to continue divulging its know-how and trade secrets, Meijer terminated its involvement with Mad Mobile on pretextual reasons. Its internal team is now continuing to build out the software and business processes. Meijer recently admitted that, for months, it took no efforts to sequester that team or prevent its misuse of Mad Mobile's Proprietary Technology. Meijer is now using, and will continue to use, Mad Mobile's Proprietary Technology without Mad Mobile's permission and in violation of the parties' agreement, the Defend Trade Secret Act (18 U.S.C. § 1836(c)), and New York common law (the law governing the parties' agreement).

4.      Under the parties' contract, Mad Mobile has demanded arbitration of its claims against Meijer. As the contract also provides, Mad Mobile comes to this Court for a preliminary injunction, pending resolution of the arbitration, to stop Meijer from using Mad Mobile's Proprietary Technology. Without that injunction, any relief Mad Mobile may obtain in the arbitration would be relatively meaningless. Accordingly, the Court should preliminarily enjoin Meijer from using, disclosing, or further developing Mad Mobile's Proprietary Technology.

## PARTIES

5.      Mad Mobile is a corporation organized under the laws of Florida with its principal place of business in Tampa, Florida. Mad Mobile develops software applications for use by customers and employees at retail establishments such as stores and restaurants.

6.      Meijer is a limited partnership organized under the laws of Michigan. Its sole General Partner is Meijer Group, Inc., which is a corporation organized under the laws of Michigan

with its principal place of business in Grand Rapids, Michigan. Meijer is a major supercenter chain with approximately 259 stores located in Michigan, Illinois, Indiana, Kentucky, Ohio and Wisconsin. On information and belief, it is one of the largest private companies, and one of the largest retailers by revenue, in the United States.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity), because the parties are completely diverse (Mad Mobile is a citizen of Florida for diversity purposes; Meijer is a citizen of Michigan for diversity purposes) and the amount in controversy exceeds $75,000, exclusive of costs and interests.

8.      This Court also has subject-matter jurisdiction over the Federal Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), and jurisdiction over all the other claims that form part of the same case or controversy as those claims under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendant. Meijer is a Michigan limited partnership and its principal place of business is in Michigan.

10.     The Court has jurisdiction to award preliminary injunctive relief, notwithstanding the parties' agreement to arbitrate their disputes. As described herein, the parties carved out from the arbitration clause (1) the right to get an injunction for enforcement of the contractual provision relating to confidential information, and (2) the right to get an injunction related to a license provided in the "Transitional Services" provision in one of the relevant statements of work. Federal courts generally have jurisdiction to award preliminary injunctive relief "in aid of" arbitrations to preserve the *status quo* pending the completion of the arbitration process. *See Performance Unlimited, Inc. v. Questar Publishers*, Inc., 52 F.3d 1373, 1380 (6th Cir. 1995).

- 3 -

11.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) (because Defendant is a resident of and headquartered in this District) and § 1391(b)(2) (because a substantial portion of the events giving rise to the claims herein occurred in this judicial district). Furthermore, § 15.7 of the parties' contract (identified below) requires that the "venue for any action concerning [the contract] shall be exclusively [ ] in Kent County, Michigan if brought by [Mad Mobile]."

## FACTS

**Mad Mobile Uses Proprietary Technology to Deliver**
**Advanced Sales Systems for Retail Stores and Restaurants**

12.     Retail stores and restaurant chains use a variety of disparate systems and equipment: customer-facing Point of Sale ("**POS**") terminals, employee-facing registers, and backroom systems for payment transactions, sales management, and so forth.

13.     Mad Mobile's Proprietary Technology brings together these different systems so that changes and upgrades can be made to certain devices without requiring system-wide changes. This Proprietary Technology is built on Mad Mobile's singular knowledge and expertise in connecting separate systems into a single platform. Mad Mobile has solved this problem in a way none of its competitors have.

14.     Mad Mobile has developed a unique product offering that it calls "Mad Mobile Connected Commerce." This is a solution for enterprise retail that effectively allows customers to connect various platforms without having to replace legacy software and hardware investments. Mad Mobile developed its offerings over a decade, through investment of millions of dollars in research and development, and as a result of many multi-year, multi-million-dollar implementations and engagements with global retailers.

- 4 -

15.     The Proprietary Technology associated with Mad Mobile's Connected Commerce offerings fall largely into 3 representative categories, including: (1) a Connected Commerce Operating System ("CCOS") that Mad Mobile developed, inclusive of its associated architecture mapped around Solutions, Applications, Events, Services, Schema, Hardware Abstractions, Connected Commerce API, Connectors, and Compositions; (2) a Checkout Solution that Mad Mobile developed and productized and licensed to Meijer and other global retailers; and (3) proprietary configurations required to adapt hardware from a third-party manufacturer. The Proprietary Technology is described in detail in the Declaration of Jack Kennedy, Mad Mobile's Executive Vice President of Platform Solutions, being filed in support of Mad Mobile's Motion for Preliminary Injunction.

16.     The value of Mad Mobile's Proprietary Technology depends on safeguarding its secrecy. Accordingly, Mad Mobile rigorously protects the confidentiality of its Proprietary Technology. Among other measures, Mad Mobile requires employees, customers, and vendors to execute confidentiality and non-disclosure agreements that prohibit use of Mad Mobile Proprietary Technology for anything other than Mad Mobile's business and customers' contracts with Mad Mobile, and that further prohibit them from placing Mad Mobile's Proprietary Technology in unsecure devices or communications. Mad Mobile encrypts and password-protects its networks and files and requires secure keycard access to its physical premises.

17.     Mad Mobile is successfully using its Proprietary Technology to build its business in a very competitive environment. It competes against numerous software developers that have attempted to build similar systems as well as larger retail chains that have attempted to do so with internal staff.

**Meijer Contracted Mad Mobile to Use its Proprietary**
**Technology for Meijer's Grocery Store Self Check Out Lanes**

18.    In 2018, Meijer approached Mad Mobile about developing software for customer self-checkout ("**SCO**") lanes in Meijer's supercenters. Meijer was impressed with Mad Mobile's capabilities and commented that, having spoken with several of Mad Mobile's competitors, Meijer found Mad Mobile's technology superior and more advanced than any other option available on the market.

19.    On April 19, 2019, Mad Mobile and Meijer entered into the "Mad Mobile Software and Services Agreement" ("**SSA**"). The SSA provides general terms applicable to various software development projects Mad Mobile would perform for Meijer. Sections 1.16 and 2.1 of the SSA provided that each software development project would be set forth in its own Statement of Work ("**SOW**").

20.    The SSA is a Software as a Service ("**SaaS**") contract. Mad Mobile agreed to deliver and support working software ("**Software**") and related documentation ("**Documentation**"), both of which incorporate Mad Mobile's Proprietary Technology.

21.    In exchange, Meijer agreed it would pay Mad Mobile development fees and then annual fees to license use of the Software ("**SaaS Fees**"). SSA § 6.1.

22.    Meijer agreed that it may only use the Software and Documentation so long as it is paying SaaS Fees. When the SSA expires in the absence of a Triggering Event (discussed below), Meijer must "cease using the Software." SSA § 5.3; *see also id.* § 3.1 (Meijer may use Software and Documentation only for "internal business purposes as long as this Agreement is in effect and [Meijer] is not in default").

23.    SSA § 14.1 also protected Mad Mobile's "**Confidential Information,**" defined to include its "technology and technical information, product plans and designs, services plans and

designs, [and] business processes," and specifically also "the Software and Documentation." Meijer agreed not to use or disclose Mad Mobile's Confidential Information. SSA § 14.2. Meijer agreed that "a breach of this Section 14 will give rise to irreparable injury" and "hereby consents to [Mad Mobile] obtaining injunctive relief against the breach or threatened breach of the obligations contained in this Section 14," and that "such an order may be issued pending final determination thereof and without the requirement to post bond." SSA § 14.3.

24.    The SSA provided that all Software and Documentation that Mad Mobile would deliver to Meijer would be owned by Mad Mobile, and that Meijer only obtains a nonexclusive license to use the Software for its internal purposes for the duration of the SSA. SSA §§ 2.1, 3.1, 5.3, 14.1.

25.    The SSA provides that it "shall be governed by and construed under the laws of the State of New York without regard to the conflicts of law provisions thereof." SSA § 15.7.

**Mad Mobile Delivered SCO Software Under SOW1**

26.    At the time the parties entered the SSA, Meijer was using SCO lane hardware manufactured by a third party, which came with standard software. Meijer had told Mad Mobile that it found the manufacturer's solution frustrating, because of the time it took to get the manufacturer to make changes to the user interfaces.

27.    To provide for Mad Mobile to develop a next-generation SCO, the parties agreed to their first SOW, "Next Gen POS Development" ("**SOW1**"), which they attached to the SSA. SOW1 provided for Mad Mobile to develop and deliver a license to use **SCO Software** to Meijer, in exchange for certain development and SaaS Fees.

28.    Mad Mobile completed full development of the SCO Software, which met all the technical requirements in SOW1. Mad Mobile provided the product to Meijer for acceptance testing on March 31, 2021. Meijer put the SCO Software in select stores and let customers use it.

29.     Meijer continuously used the SCO Software after its implementation in its stores in March 2021. For example, Mad Mobile observed the SCO Software operating in Meijer's Cedar Springs, Michigan store (Store #248) on or about February 6, 2023, and, on information and belief, Meijer has also used it in other stores. Meijer also provided customer feedback using the SCO Software in multiple support tickets, customer messages, and emails and weekly governance meetings between the companies. Meijer also showed an internal presentation with dates and actions taken by Meijer to use the SCO Software in its stores.

**Mad Mobile Developed "Fixed Lane Software"
and "Extended SCO Software" Under SOW3**

30.     Mad Mobile's work for Meijer was only just beginning. Meijer business executives were so impressed with Mad Mobile's SCO Software that they wanted Mad Mobile to rebuild the software at checkout terminals used by Meijer's sales associates for Fuel, Price Check, Shop & Scan, Electronics, Attendant, Service Desk, Pharmacy, Loyalty, Curbside and Deli, what the parties called "Fixed Lane" terminals (**"Fixed Lane Software"**).

31.     Fixed Lane Software was well outside the scope of SOW1. Therefore, on November 11, 2021, the parties executed another SOW via a Mad Mobile "Implementation Services Order" and related "Software Services Order" (together, **"SOW3"**).[1]  SOW3 obligated Meijer to pay for development of Fixed Lane Software with various installments through July 2022. Meijer also promised to pay additional annual SaaS fees (that is, in addition to those in SOW1) for the period when Meijer used the software starting November 2022.

32.     In addition, while Mad Mobile was building the Fixed Lane Software, Meijer repeatedly requested changes to the SCO Software that were *not* specified in or added to SOW1—

---

[1]     SOW2, executed on December 23, 2019, is not at issue here.

thus always moving the target on Mad Mobile. SOW3 referred to this evolved software product as the "Extended SCO" (**"Extended SCO Software"**).

33.     These and many other late-identified and changing requirements continually imposed new demands and costs on Mad Mobile.

34.     Mad Mobile worked feverishly, expending its own capital, to meet Meijer's ballooning and changing requirements.

35.     The companies met every two weeks to identify current work and upcoming action items. At these meetings and in daily communications over the years working together, Mad Mobile disclosed to Meijer employees how Mad Mobile was using its Proprietary Technology to provide solutions to Meijer and how Meijer could reengineer their systems and business processes.

36.     By August 2022, Mad Mobile had a team of 38 employees working full-time on its software products for Meijer. Mad Mobile had that team intact through March 2023.

37.     Furthermore, Mad Mobile was using its own funds to subsidize its work for Meijer. From the start of the parties' relationship through March 2023, Mad Mobile's employee costs alone were *more than twice* its total revenue from Meijer.

38.     Mad Mobile undertook all this additional work, and at its own great expense, because it deemed Meijer a close business partner. Furthermore, Mad Mobile expected to recoup its investment in two ways: through the SaaS fees that Meijer would owe Mad Mobile for using Mad Mobile's Software, and through the ability to market and license the SCO Software product to other large retail chains.

39.     Meijer knew and agreed with Mad Mobile's plan to sell the SCO Software to other retail chains. Meijer executives even told Mad Mobile that they would introduce Mad Mobile to

executives at other retail chains. The contract also contemplated that Mad Mobile could sell its SCO Software to other chains.

**Mad Mobile Continued Working from December 2022 to March 2023**

40.     In December 2022, Meijer requested not only that Mad Mobile continue working on Meijer's ever-evolving requirements for SCO and Fixed Lane Software, but that Mad Mobile *increase* its efforts. Meijer said it wanted to deploy all SCO and Fixed Lane Software by Fall 2023. Meijer requested that Mad Mobile meet Meijer's deadline by increasing its team from 38 full-time employees to 55.

41.     In response, Mad Mobile explained how its development costs were far exceeding its revenue; Mad Mobile was incurring about $1 million *a month* for Meijer with its team of 38 employees. With the end of SOW3 funding in November 2022, Mad Mobile requested that Meijer put additional funding into the enormous development effort.

42.     As the parties negotiated a new funding vehicle, Meijer requested that Mad Mobile continue performing, promising that it would pay Mad Mobile, and on March 16, 2023, Meijer told Mad Mobile that its executives approved significant funding in 2023 for this additional work.

43.     Between December 2022 and March 2023, the parties negotiated a new statement of work to cover Mad Mobile's ongoing effort, which became known as "**SOW4**." Mad Mobile provided Meijer a draft written SOW4. On March 16, 2023, Mad Mobile transmitted to Meijer a copy of SOW4 that Mad Mobile had executed, and Meijer's Director of IT Buzz Seifert sent a text message to Mad Mobile saying that SOW4 was already being processed by Meijer. On March 20, 2023, Mr. Seifert sent back a copy of SOW4 with minor changes that Mad Mobile accepted. Mad Mobile was informed that a clean version was being sent to Meijer executives for signature. A day later, March 21, 2023, Meijer again pressured Mad Mobile to continue working on this project and asked when Mad Mobile would increase its team to 55 employees.

- 10 -

44. Mad Mobile relied on Meijer's promises and conduct. As of that last week of March 2023, Mad Mobile kept its full team working nonstop on Software for Meijer and was interviewing candidates to staff the additional positions Meijer demanded.

**Meijer Crafted a Scheme to Steal Mad Mobile's Proprietary Technology**

45. Meijer schemed behind Mad Mobile's back to steal Mad Mobile's Proprietary Technology so that Meijer could finish the software project with its own development team. By cutting out Mad Mobile, Meijer wanted to own the software and avoid paying Mad Mobile usage fees. Other large retailers like Walmart, Target and Home Depot have developed their own software, and Meijer wanted to do the same. It is worth noting that Meijer's SCO project was led by its VP of Customer and Digital Technology, who previously worked on Walmart's software development programs.

46. By March 2023, Meijer's in-house team of software development employees and contractor employees had grown from about 20 employees in 2019 to one that was significantly larger than Mad Mobile's team. Meijer built up its team to take over the project from Mad Mobile. But Meijer still needed to wring as much Proprietary Technology out of Mad Mobile as it could before removing Mad Mobile from the project.

47. Meijer invited Mad Mobile personnel to Meijer's facilities on March 29 and 30, 2023, for regular two-day meetings. On the first day, Meijer's entire team attended those meetings in person or on the phone. Meijer still had not signed SOW4, despite having promised to do so, leading Mad Mobile to believe that execution was in process, and obtaining Meijer's performance of SOW4 for four months. During the meeting, Mad Mobile presented its ongoing work for Meijer and answered numerous questions from Meijer's team.

48. At the end of that first day of meetings, Meijer shocked Mad Mobile by revealing its scheme. Meijer's Vice President responsible for its POS program requested a call with Mad

Mobile's Chief Executive Officer and its Executive Vice President of Global Sales. On this call, Meijer informed Mad Mobile that Meijer was "firing" Mad Mobile. Meijer informed Mad Mobile that Meijer believed Mad Mobile was in breach of the SSA, and that Meijer intended to use a clause in the SSA to buy the source code for the software that Mad Mobile had developed for Meijer.

49.     Right after making that call, and after asking all their technical questions and getting Mad Mobile's answers throughout the day, Meijer essentially walked Mad Mobile employees out of the building and told them not to come back. On information and belief, while still convened *en masse* in Grand Rapids, Meijer's technical employees continued to meet and discuss the SCO project and roll-out on the second day of the meeting.

50.     Within a couple days after the meeting and call, Meijer's Vice President emailed Mad Mobile's CEO to walk back her comment that Meijer was "firing" Mad Mobile. Instead, she said Meijer wanted to "wind down" its relationship with Mad Mobile and acquire Mad Mobile's software.

51.     Also within two or three days afterwards, Meijer cut off Mad Mobile's access to Meijer's computer systems that were necessary for Mad Mobile to continue its work for Meijer. Mad Mobile stood ready, willing, and able to continue to support the working solution that it had provided to Meijer. But, as of the beginning of April 2023, Meijer completely pulled the plug on Mad Mobile and abandoned the SSA.

52.     Meijer first tried to *buy* Mad Mobile's Proprietary Technology. The SSA (§ 13.2) required a meeting of senior managers to address contract disputes. The parties held that meeting on April 26, 2023 at Mad Mobile's offices in Tampa. Prior to the meeting, on April 12, 2023, Meijer presented a draft "Asset Purchase Agreement" for Mad Mobile and Meijer to be joint

- 12 -

owners of Mad Mobile's software, associated system and user documentation, and trade secrets, which Meijer's draft APA defined Mad Mobile's "trade secrets" to include "technical information, design, process, procedure, formula [and] improvement[s]."

53. Meijer told Mad Mobile they wanted to have the ownership of the software and these "trade secrets" so they could use it not only for internal purposes (that is, the scope of the Transitional License) and implied they could sell the Software to other retail chains.

54. But Mad Mobile refused to sell its Proprietary Technology to Meijer.

55. Having failed to buy the Proprietary Technology, Meijer then claimed it had a right to use Mad Mobile's Proprietary Technology—and even have Mad Mobile deliver the *source code* to the Software—by falsely claiming Mad Mobile had breached the SSA.

56. On July 10, 2023, Mad Mobile notified Meijer in writing that Meijer was in breach for multiple reasons, including failure to pay SaaS fees under SOW1 and failure to pay development fees under SOW4 (the "**Mad Mobile Breach Notice**").

57. Rather than respond to these points, Meijer simply chose to ignore them. On July 21, 2023, its outside counsel sent a letter claiming Mad Mobile's breaches (which never existed) were not cured (when there was nothing to cure), and on that false basis, Meijer purported to terminate the SSA.

58. On August 15, 2023, Mad Mobile's outside counsel wrote Meijer's outside counsel, notifying Meijer that it was in breach for multiple reasons—including anticipatorily repudiating the SSA by purporting to terminate it for wrongful reasons, and for the reasons set forth in the Mad Mobile Breach Notice—and notifying Meijer that Mad Mobile was terminating the SSA for Meijer's breach (the "**Mad Mobile Termination Notice**").

59.     Meijer has no right or license to use Mad Mobile's Proprietary Technology, including the Software, as a result of the termination. SSA § 5.3 provides that, "Following termination of this Agreement by reason of a material, uncured breach by [Meijer] under this Agreement … [Meijer] shall cease use of the Software."  Similarly, SSA §3.1 states that Meijer may use the Software "for [Meijer's] and [Meijer's] Affiliates' internal business purposes as long as this Agreement is in effect and [Meijer] is not in default."

**Meijer Is Building Its Own System Based on Mad Mobile's Proprietary Technology**

60.     Despite the termination of Meijer's license to use Mad Mobile's Proprietary Technology, Meijer is using Mad Mobile's Proprietary Technology to hasten Meijer's development of its software. Meijer changed its business processes over the past four years based on Mad Mobile's Proprietary Technology.

61.     Through the past few years, Mad Mobile has disclosed its Proprietary Technology to Meijer's internal team, both verbally and in numerous written materials, including software design documents, docker image files, presentations, emails, Slack and Team messages, and so forth.

62.     Mad Mobile's Proprietary Technology is now in the heads of Meijer's IT team. The only way Meijer could avoid using Mad Mobile's Proprietary Technology is to completely replace its entire team of engineers with wholly different individuals who had never been exposed to Mad Mobile's Proprietary Technology. Based on information and belief, Meijer has not done that but will use members of the same team to recreate Mad Mobile's Software.

63.     Meijer also is using third-party software development contractors, for example Capgemini (a French software consulting firm with engineers in India), to build specific pieces of the system. On information and belief, Meijer has shared, and will continue to share, Mad Mobile's Proprietary Technology with those contractors.

64. It is not reasonably feasible for Meijer to develop its own versions of SCO and Fixed Lane software programs without using Mad Mobile's Proprietary Technology—unless perhaps it wants to start from scratch and yet again revise its business processes. To the contrary, Meijer represented at the March 29 meeting that it intended to roll out all the software in 2024. Mad Mobile is aware that some companies in the industry have taken many years (as many as eight) to try to develop these types of systems, at great expense and without the benefit of Mad Mobile's Proprietary Technology. Thus, to meet its aggressive deadline, Meijer necessarily will be using Mad Mobile's Proprietary Technology.

65. Meijer implicitly concedes it has used Mad Mobile's Documentation (containing its Proprietary Technology) to develop its software, and that it will continue using the Proprietary Technology known to its large team.

66. On September 14, 2023, Mad Mobile's counsel wrote Meijer's counsel reasonably requesting that Meijer promise not to use or further disclose Mad Mobile's Proprietary Technology, identify individuals (including third-parties) who had been provided access to Mad Mobile's Proprietary Technology, sequester the technology, and submit to an audit of Meijer's next generation systems to determine whether Meijer used Mad Mobile's Proprietary Technology.

67. Meijer responded through counsel on September 21, 2023, refusing to provide the reasonable assurances that Mad Mobile requested. Notably it refused to allow Mad Mobile to forensically examine its systems or to provide contact information for individuals who had access to Mad Mobile's Proprietary Technology.

68. Perhaps most glaringly absent from Meijer's response was any assurance or statement that Meijer was not making use of Mad Mobile's technical know-how, processes, and schema. Indeed, Meijer provided no assurances that it was not using, among other things, Mad

Mobile's methods developed for the third-party manufacturer's system, proprietary architectural approaches, solution layout, compositions, orchestrations, abstractions, or otherwise. Upon information and belief, Meijer can make no such statement because Mad Mobile's Proprietary Technology is now indelibly embedded in Meijer's next-generation system.

**Mad Mobile Is Irreparably Harmed by Meijer's Continued Development of Its Own Software Using Mad Mobile's Proprietary Technology and Software**

69.     Meijer's unauthorized and unlicensed use of Mad Mobile's Proprietary Technology immediately and directly harms Mad Mobile.

70.     Mad Mobile's Proprietary Technology provides Mad Mobile a unique competitive advantage. Meijer even recognized that fact, praising Mad Mobile's unique capabilities as a reason Meijer selected Mad Mobile.

71.     But now its Proprietary Technology is out of Mad Mobile's hands. Meijer and its employees and contractors are using it for Meijer's own purposes, and Mad Mobile cannot control how Meijer or these other parties use or disclose it. Meijer even implied it intends to market the software it develops (which will be based on Mad Mobile's Proprietary Technology) in competition against Mad Mobile.

72.     As a result of Meijer's continued possession and use of Mad Mobile's Proprietary Technology, Mad Mobile not only loses the competitive advantage it has enjoyed by being the only company using this Proprietary Technology, but also loses control of that Proprietary Technology altogether.

**Mad Mobile Has Demanded Arbitration and**
**Seeks an Injunction In Aid of That Arbitration**

73.     Pursuant to SSA § 13.2 ("Arbitration"),[2] on September 14, 2023, Mad Mobile

demanded arbitration before a three-arbitrator panel ("Tribunal") at the American Arbitration

Association ("AAA") under its Commercial Arbitration Rules. The arbitration must be completed

"within 180 days of the date of the initial or preliminary hearing or conference." *See id.* The AAA

has docketed Mad Mobile's demand as Case No. 01-23-0004-0904.

74.     Meijer and Mad Mobile agreed that Mad Mobile may come to this Court to obtain

preliminary injunctive relief in aid of an arbitration. SSA § 14.3 states that Meijer "consents to

[Mad Mobile] obtaining injunctive relief against the breach or threatened breach of the obligations

contained in this Section 14 [Confidentiality]."  Similarly, SOW1 § 10 states that Mad Mobile

"may apply for emergency equitable relief in the form of a declaration that a Triggering Event . . .

has not occurred."

## COUNT ONE
## BREACH OF CONTRACT

75.     Mad Mobile incorporates by reference each of the foregoing allegations as if stated

in full herein.

76.     The SSA is a written and enforceable contract by and between Mad Mobile and

Meijer.

77.     Mad Mobile has fully performed all its obligations in the SSA and is equally

entitled to Meijer's full performance. No conditions precedent exist that would bar, preclude or

limit Meijer's obligations to Mad Mobile under the SSA.

---

[2]     The SSA erroneously contains two sections numbered "13.2."  The Arbitration section is
the latter of the two.

78. Meijer also is in breach of the SSA by failing to "cease using" the Software as required by SSA §§ 3.1 & 5.3; *see also id.* § 8.1 ("Licensee represents and warrants that: ... Licensee will not use the Software in any manner that is contrary to applicable law")

79. Meijer also is in breach of SSA § 14.2 by using (and/or allowing third parties to use) Mad Mobile's Confidential Information, including the Software and Proprietary Information, for purposes not authorized by the SSA.

80. Mad Mobile is likely to succeed on the merits of these claims in the arbitration.

81. Mad Mobile will be irreparably harmed by Meijer's breach in the absence of preliminary injunctive relief. Meijer will continue using Mad Mobile's Proprietary Technology and Confidential Information, including its Software and Proprietary Technology, without authorization and without Mad Mobile's consent.

82. The harm to Mad Mobile without preliminary injunctive relief outweighs any impact on Meijer from issuance of preliminary injunctive relief.

83. The public's interest supports issuance of preliminary injunctive relief.

## COUNT TWO
## MISAPPROPRIATION UNDER
## FEDERAL DEFEND TRADE SECRETS ACT

84. Mad Mobile incorporates by reference each of the foregoing allegations as if stated in full herein.

85. Mad Mobile's Proprietary Technology constitutes one or more "trade secrets" under the federal Defend Trade Secrets Act, as defined in 18 U.S.C. § 1839(3).

86. The Proprietary Technology is valuable to Mad Mobile, would be valuable to competitors, and was developed at great expense by Mad Mobile.

87.     Mad Mobile expends reasonable efforts to protect the secrecy of the Proprietary Technology, and the Proprietary Technology is not known by its competitors through legitimate means.

88.     Use of the Proprietary Technology by Meijer, and its disclosure of the Proprietary Technology to third parties, harms Mad Mobile's reputation and business interests.

89.     Meijer misappropriated Mad Mobile's trade secrets by using and disclosing them, and is threatening to continue to use and disclose them in the future, without Mad Mobile's authorization or consent.

90.     Mad Mobile is entitled to a preliminary injunction under 18 U.S.C. § 1836(b)(3)(A) against Meijer's actual and threatened misappropriation of Mad Mobile's trade secrets.

91.     Mad Mobile will be irreparably harmed by Meijer's misappropriation in the absence of preliminary injunctive relief. Meijer will continue using and disclosing Meijer's trade secrets without authorization and without Mad Mobile's consent.

92.     The harm to Mad Mobile without preliminary injunctive relief outweighs any impact on Meijer from issuance of preliminary injunctive relief.

93.     The public's interest supports issuance of preliminary injunctive relief.

**COUNT THREE**
**TRADE SECRRET MISAPPROPRIATION**
**UNDER NEW YORK COMMON LAW**

94.     Mad Mobile incorporates by reference each of the foregoing allegations as if stated in full herein.

95.     Mad Mobile's Proprietary Technology constitutes one or more "trade secrets" under New York common law, because they derive independent economic value from being confidential and not being known in the industry.

96.     Mad Mobile has taken reasonable precautions to maintain their secrecy and to prevent their disclosure to or use by unauthorized persons.

97.     Mad Mobile provided its trade secrets to Meijer in confidence, subject to contractual limitations on Meijer's use and disclosure of those trade secrets. Mad Mobile negotiated the SSA, including §§ 5.3 and 14, to protect the confidentiality of its trade secrets and to prohibit Meijer's unauthorized use of those trade secrets.

98.     Meijer presently is disclosing and using and intends to disclose and use Mad Mobile's trade secrets without authorization and in breach of its duties owed to Mad Mobile.

99.     Mad Mobile is entitled to a preliminary injunction against Meijer's misappropriation of Mad Mobile's trade secrets.

100.    Mad Mobile will be irreparably harmed by Meijer's misappropriation in the absence of preliminary injunctive relief. Meijer will continue disclosing and using Meijer's trade secrets without authorization and without Mad Mobile's consent.

101.    The harm to Mad Mobile without preliminary injunctive relief outweighs any impact on Meijer from issuance of preliminary injunctive relief.

102.    The public's interest supports issuance of preliminary injunctive relief.

## **PRAYER FOR PRELIMINARY INJUNCTIVE RELIEF**

Wherefore, Mad Mobile respectfully requests that the Court enter a preliminary injunction in Mad Mobile's favor and against Meijer barring Meijer (and any persons or entities working with Meijer) from using, disclosing, copying, or developing Mad Mobile's Proprietary Technology until such time that the Tribunal can issue a final award and such other relief that this Court deems just and proper.

Dated:  September 27, 2023

- 20 -

By:

Lee T. Silver (P-36905)
BUTZEL LONG
300 Ottawa Avenue, N.W., Suite 620
Grand Rapids, MI 49503
Tel. 616 988 5600
Fax 616 988 5606
Silver @butzel.com

James S. Rosenfeld (P-39434)
BUTZEL LONG
150 West Jefferson, Suite 100
Detroit, MI 48226
Tel. 313 225 7000
Fax 313 225 7080
rosenfeld@butzel.com

Luke T. Cadigan (*application for admission pending*)
Michael J. McMahon (*application for admission pending*)
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
Tel. 617 937 2300
Fax 617 937 2400
lcadigan@cooley.com
mmcmahon@cooley.com

John Paul Oleksiuk (*application for admission pending*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Tel. 212 479 6000
Fax 212 470 6275
jpo@cooley.com

David A. Vogel (*application for admission pending*)
COOLEY LLP
One Freedom Square | Reston Town Center
11951 Freedom Dr.
Reston, VA 20190-5656
Tel. 703 456 8000
Fax 703 456 8100
dvogel@cooley.com

- 21 -